618 So.2d 1048 (1993)
COMMERCE INSURANCE AGENCY, INC.
v.
Trudeau J. HOGUE, III.
Trudeau J. HOGUE, III and Hogue & McAdams Insurance
v.
Ernest L. McADAMS, Jr., et al.
Nos. CA 92 0327, CA 92 0328.
Court of Appeal of Louisiana, First Circuit.
April 23, 1993.
Rehearing Denied June 16, 1993.
*1049 Dowell R. Fontenot, and M. Aubrey McCleary, Jr., Baton Rouge, for plaintiff-appellant Commerce Ins. Agency, Inc.
John Dale Powers and Mary A. Cazes, Baton Rouge, for defendant-appellee Trudeau J. Hogue, III.
Before LOTTINGER, C.J., and FOIL and FOGG, JJ.
FOIL, Judge.
In these consolidated suits brought by the parties to a contract of sale, we are asked to determine whether the contract is enforceable and whether either of the parties is entitled to damages. The trial court ruled that the contract was a nullity due to failure of consideration, but refused to award either party damages. We reverse the factual finding of the trial court on the enforceability issue and hold that the party seeking to enforce the contract substantially breached the contract and cannot therefore recover damages for nonperformance. Further, we affirm its ruling on the damage issues, but amend the judgment to allow an award of partial restitution.

FACTS
Commerce Insurance Agency, Inc. of Baton Rouge (CIA) filed this suit against Trudeau Hogue, III, seeking to enforce a contract of sale of its "Book of Business." Hogue asserted affirmative defenses and also filed a separate suit against, among others, CIA and Earnest McAdams, the owner of CIA, alleging breach of contract. The suits were consolidated for trial, during which the following evidence was adduced: Hogue, an insurance agent, was acquainted with McAdams and went to work for McAdams at CIA in 1983 as a salaried insurance salesman. Sometime thereafter, the two began to discuss the sale of CIA's business to Hogue. The elder McAdams wished to take on a rather inactive role in the insurance business. Because he did not want to be faced with potential liability, he wished to set Hogue up in a separate insurance entity. McAdams was to take on an advisory role in the new agency, and would work to procure new insurance business on behalf of Hogue. They also agreed that some of CIA's clients would not be transferred to Hogue and that McAdams would continue to write the insurance on certain specified policies.
To carry out their objectives, the parties agreed that CIA would sell Hogue its "Book of Business." They executed a preliminary agreement setting forth many of *1050 the details of the proposed sale, and executed a contract of Sale and Purchase on February 19, 1986. In the contract, the parties agreed that Hogue would pay $115,000.00[1] for the Book of Business. Also, Hogue agreed in the contract to pay automobile, travel and entertainment expenses on behalf of McAdams, and to pay health insurance for Mr. and Mrs. McAdams. The contract provided that these obligations were to remain in effect during the McAdams' lifetime.
The contract of sale specifically excluded all accounts of Capital Bank & Trust Company and all flood insurance accounts. While the contract declared that the Book of Business was attached thereto, there was no copy of the client list comprising the Book of Business attached to the contract.
Additionally, the contract contained a clause specifically allowing McAdams to compete with Hogue. That clause stated:
Buyer acknowledges the existence of Union Management Company and Commerce Insurance Agency of Baton Rouge, Inc. and Harper-Cox McAdams & McAdams Inc., all of which are entities in which Ernest L. McAdams, Jr. or Mary Joyce Cox McAdams, may now or may in the future hold an interest and which will continue to do business in competition with Buyer. Buyer agrees that the sole property being acquired with this transaction is the Book of Business as described above under the terms and conditions contained therein.
A reversionary clause in the contract provided that Hogue's nonperformance of his contractual obligations would result in the restitution of the Book of Business back to McAdams. It further set forth that Hogue's nonperformance would result in his having to pay McAdams three times the total consideration as a penalty.
The parties testified regarding the object of the sale, the Book of Business, and how the $115,000.00 sales price was arrived at. Prior to the execution of the contract, McAdams and Hogue went over a list containing all of CIA's accounts current. This written document contained all of CIA's active customers over a twelve-month period. From this list, McAdams called out the names of the clients and the amounts of the premiums. Hogue wrote down the amount of the premiums, totalled the figures and came out with a sixty-eight to seventy thousand dollar annual premium. This figure and a certain multiplier were used to arrive at the $115,000.00 purchase price. There was some discrepancy in the testimony regarding whether Hogue also wrote down the names of the clients on the list.
The testimony established that both parties clearly knew what was being transferred in the Act of Sale. Hogue testified that he knew that by purchasing the Book of Business, he was receiving the agency's current account list. He explained the importance of the agency list: it reveals the type of policy, expiration date, and premium amount, which serves as a timetable for the agent to contact insureds prior to the expiration of the policy, and also is useful in soliciting business. Hogue testified that it was his experience in the insurance industry that approximately 75% of all insureds renew their policies with the same agent. He stated that while he never looked at the physical evidence of the accounts current and never actually drew up a document entitled "Book of Business," he knew it existed. He attested that CIA's accounts current list remained at CIA's office, he knew where it was stored and filed, and candidly admitted that there was "no reason for me to look at it." He stated that he never asked for a copy of the accounts current list because in his mind, that list already existed and there was simply no need to ask for it.
After purchasing the Book of Business, Hogue began operating the agency as Hogue and McAdams Insurance Agency, Ltd. He and McAdams shared an office on Goodwood Boulevard in Baton Rouge. McAdams continued to write insurance for the policies specifically excluded from the sale *1051 and to procure new business for Hogue's new agency. Although the contract was silent regarding who would pay for the operational expenses in running the separate insurance agencies out of the Goodwood office, Hogue and McAdams Insurance Agency, Ltd. paid for all expenses, including the rent, salaries for two secretaries and a bookkeeper, and all other overhead costs. In addition, Hogue honored all of his obligations on the note, paying the monthly installments as well as the agreed to expenses on behalf of McAdams and his wife.
This relationship continued from May of 1986, the effective date of the sale of the Book of Business, until October of 1987, when Hogue announced his decision to relocate in order to save money on operational expenses. According to the testimony, Hogue demanded that McAdams share in the expenses of running the office; however, McAdams refused. Hogue stated that he had no choice but to move out of the Goodwood office in order to save money. On October 1, 1987, Hogue moved his files from the Goodwood office and set up another location in which to run the business.
Hogue testified that he derived approximately sixty to seventy thousand dollars in commissions from the Book of Business from May 1, 1986, until his departure in October of 1987. However, after he left the office, Hogue's renewals steadily declined. By the time of trial, only three customers purchased in the Book of Business had policies with Hogue. He stated that 99.9% of the customers he purchased in the Book of Business did not renew their policies, and that he derived only $231.00 in commissions from the remaining policies.
Hogue attributed the lack of renewals to the conduct of McAdams in soliciting the customers he purchased in the Book of Business shortly after he moved out of the Goodwood office. The evidence firmly established that McAdams' insurance agency did indeed solicit insurance business from clients who were sold to Hogue in the Book of Business. Shortly after Hogue's departure from the office, McAdams announced that CIA was "in the insurance business again." He acknowledged that he went back into the insurance business and "grabbed everybody that we could get our hands on." Although admitting that he was soliciting customers sold to Hogue in the Book of Business, he stated that he felt they were "fair game." He testified that he had no alternative but to get back into the insurance business in order to maintain his office and keep his secretaries on the payroll. McAdams stated he presumed, from the very first day of the contract, that he could write insurance for anyone he wanted because the contract gave him the right to compete. He also viewed the clause giving him the right to compete as his "collateral" in the event Hogue breached the contract. However, he did testify that he did not feel Hogue's actions in leaving the Goodwood office constituted a breach of the contract, as Hogue was merely relocating his business elsewhere.
Regarding the competition clause, Hogue testified that he understood that provision to give McAdams the right to continue writing insurance on policies specifically excluded from the sale and to write new policies. He never contemplated that McAdams would be authorized to solicit business sold to him. He stated that it would be incredible to believe that he would obligate himself to pay automobile and entertainment expenses to McAdams if McAdams could use those funds to solicit the very business he purchased from McAdams.
The record reveals that Hogue continued to honor his obligations under the contract until March of 1988, when he ceased all payments on the advice of his attorney. His failure to honor the contractual obligations prompted this suit by CIA to enforce the contract and to recover penalties as set forth therein. Hogue answered the suit asserting the defenses of failure of consideration and error or mistake regarding the principle cause of the contract. Hogue also filed a separate suit against, among others, CIA and McAdams, alleging that McAdams breached the contract in numerous particulars, including his solicitation of the insurance accounts and clientele from the Book of Business purchased by *1052 Hogue. Hogue sought damages for loss of revenues from insurance renewals, the value of business records, loss of goodwill, and a portion of the expenses for running the Goodwood office, totalling $272,131.75.
After reviewing the evidence, the trial court ruled that the contract was null and void due to the lack of a specific or determinable object. The court also declined to award damages to either of the parties. CIA took this appeal, contesting the trial court's refusal to enforce the contract and its failure to award CIA damages. Hogue answered the appeal, challenging the failure of the trial court to award damages to him.

DISCUSSION
We first address CIA's challenge to the trial court's ruling that the contract was void due to the lack of a specific object. In arriving at this conclusion, the trial court stressed that the Book of Business was not detailed in the body of the contract and ruled, therefore, that the contract lacked definition or description. The court stated that "the purchaser got nothing capable of description other than by the phrase `Book of Business' in consideration for the purchasers obligations under the alleged contract."
After reviewing all of the evidence, we hold that the trial court erred in ruling that the Book of Business was incapable of definition or description. La.Civ.Code art. 1973 provides that the object of a contract must be determinate at least to kind; however, the quantity of a contractual object may be undetermined, as long as it is determinable. The parties testified that they knew exactly what was being sold and were well aware that the Book of Business was CIA'a accounts current list for the preceding twelve-month period. This written list was used to derive the selling price for the business. Hogue admitted that he did not need physical evidence of the Book of Business, as that evidence was contained in the office files, he knew where it was located, and he had access to it whenever he wanted. The parties to this contract clearly understood what was being bought and sold and, therefore, the trial court's finding that the contract was void due to the absence of a specific object is erroneous.
However, we hold that CIA is not entitled to the relief that it seeks on an alternative basis. We believe that by soliciting the business McAdams sold to Hogue, McAdams breached the contract. While the contract did give McAdams the right to compete, this provision contemplated competition for new accounts, along with McAdam's continued involvement in writing accounts excluded from the sale. The contract did not authorize McAdams to solicit the business he transferred to Hogue in the sale and any other conclusion is simply untenable.
The law is settled that where one party substantially breaches a contract, the other party to it has a defense and an excuse for nonperformance. McAdams cannot claim damages for the nonperformance of a contract as to which he is in default. Silverman v. Caddo Gas & Oil Co., 127 La. 928, 54 So. 289 (La.1911); Ouachita National Bank in Monroe v. Gulf States Land & Development, Inc., 579 So.2d 1115 (La. App.2d Cir.), writ denied, 587 So.2d 695 (La.1991); Central Louisiana Electric Company v. Giant Enterprises, Inc., 371 So.2d 641 (La.App.3d Cir.), writ denied, 375 So.2d 646 (La.1979); Olympic Insurance Company v. H.D. Harrison, Inc., 463 F.2d 1049 (5th Cir.1972), cert. denied, 410 U.S. 930, 93 S.Ct. 1373, 35 L.Ed.2d 593 (1973). Because McAdams substantially breached the contract of the sale of his business by soliciting the business which he sold to Hogue, he may not claim damages for Hogue's nonperformance of the contract. Thus, the trial court correctly refused to allow McAdams to recover any damages for Hogue's failure to perform under the contract.
We also agree with the trial court's refusal to award damages to Hogue. Hogue argues that the trial court should have awarded damages for bad faith breach of contract, contending that he is entitled to damages for loss of business he expected to receive, loss of goodwill, reputation and confidence of his clients.
*1053 La.Civ.Code art. 1995 provides that damages are measured by the loss sustained by the obligee and the profit of which he has been deprived. La.Civ.Code arts. 1996 and 1997 set forth damages allowable against an obligor in good faith, as opposed to an obligor in bad faith. The record does not support a finding of bad faith on McAdams' part. Further, any award of damages for loss of business revenues or lost profits based on the record before us would be entirely speculative, and we decline to enter an award for those damages sought by Hogue.
However, we believe that Hogue should be entitled to recoup the payments he made to McAdams after the time that McAdams actively breached the contract, at which point Hogue was no longer contractually obligated to make those payments. The record contains letters, dated October 21, 1987, soliciting clients who were purchased in the Book of Business. The record reveals that after this date, the following amounts were paid by Hogue pursuant to the contract: (1) The note  $10,669.99; (2) Auto expenses$825.00; (3) Health Insurance$1,756.95; (4) Travel and Entertainment expenses$2,050.00. We hold that Hogue is entitled to recover $15,301.94 from McAdams, representing the payments made by Hogue after the date of McAdam's breach of the contract.

CONCLUSION
Based on the foregoing, the judgment of the trial court refusing to enforce the contract at issue, and declining to award damages to either party thereto is affirmed. The judgment of the trial court is amended to reflect an award to Trudeau Hogue, III in the amount of $15,301.94. All costs of this appeal are assessed to appellant, Commerce Insurance Agency.
AMENDED AND AFFIRMED.
NOTES
[1] For this amount, Hogue executed a promissory note for $115,000.00, with interest, payable in 60 monthly installments, beginning September 10, 1986.