PARRO, J.
|2In this dispute about three contracts between a drilling rig company and two barge building companies, a jury found the drilling rig company had breached its obli *749 gations under the contracts and awarded damages to the barge builders. On the drilling rig company’s motion, the trial court granted a judgment notwithstanding the verdict (JNOV), finding that the breach had been by the barge builders, and made an award to the drilling rig company. The plaintiffs/appellants, barge builders LAD Services of Louisiana, L.L.C., and LAD Salvage, L.L.C.,[1] appeal the trial court’s entry of the JNOV. For the following reasons, we reverse the JNOV, and we reinstate the March 23, 2012 judgment rendered in accordance with the jury’s verdict, affirm that judgment in part, reverse that judgment in part, and remand.
FACTUAL AND PROCEDURAL BACKGROUND
On or about December 4, 2007, Superior Derrick Services, L.L.C. (SDS), entered into the first of three contracts with LAD Services of Louisiana, L.L.C. (LAD). In the initial contract, LAD leased two small deck barges to SDS. In the second and third contracts, SDS engaged LAD to build a barge under each contract. They entered into the second contract on December 5, 2007. In that contract, SDS engaged LAD to build a barge measuring 180' long by 70' wide by 11' deep. Once LAD completed building that barge, SDS intended to add additional equipment to it, then deliver it to an SDS customer, Petrol-eos de Venezuela (PDVSA). The parties entered into the third contract on March 20, 2008. The third contract was very similar to the second, in that SDS engaged LAD to build it another barge of the same size. For each barge, the parties arranged to have SDS furnish, at the start of the contract, a down payment as well as the funds that LAD would use to pay for the steel to build each barge.[2] For both barges, the contracts provided that SDS would provide progress payments to LAD as construction moved forward.
IsWhen the construction of barge one was well along, and the construction of barge two was still in its early stages, SDS advised LAD that it was cancelling the contract for barge two. SDS told LAD that it was cancelling because its customer for both barges, PDVSA, wanted SDS to use a barge builder other than LAD for barge two.[3] LAD stopped work on barge two on June 8, 2008.
Around July 11, 2008, LAD finished barge one and turned it over to SDS. However, when SDS sent LAD its final payment for barge one, it deducted an amount equal to its down payment for barge two, which was $225,600. LAD’s owner, Lee Dragna, said at trial he was not aware of that deduction when LAD gave SDS possession of the barge, but once LAD delivered it “there was nothing we could really do about it.”
*750 The steel that LAD had purchased to go into barge two stayed at LAD’s yard. Mr. Dragna said at trial that he asked SDS to pick it up, but SDS said it did not want it. SDS’s project manager, Charlie Albert, said at trial that SDS did not want the steel because the quantity was insufficient for LAD’s replacement contractor to build barge two.
In about February 2009, LAD ascertained that it had not been sending monthly invoices to SDS for renting the two barges it had leased to SDS in December 2007, and that SDS had not been paying the rent. Mr. Dragna said that when he inquired about the barges, an SDS representative said it would not release them because LAD still owed SDS money from the contract for barge two. Subsequently, LAD did retake possession of its two rental barges from SDS.
On August 28, 2009, LAD sued SDS for amounts it claimed SDS owed under all three contracts. It alleged generally that SDS was liable for: (1) underpaying it by $235,000 for barge one; (2) causing LAD to lose profits from the cancellation of the contract for barge two; (3) failing to pay $100 per day for each of the two barges it leased from LAD, subject to a 60-day credit on the first rental barge; (4) storage fees [4for storing the steel for barge two in LAD’s yard; and (5) the cost of two trips LAD was required to make to retrieve its two rental barges.
SDS reconvened, alleging generally that LAD was liable for: (1) $704,000 that SDS had paid to LAD to start work on barge two, which LAD had not returned after the contract for barge two was cancelled; (2) $20,000 for LAD’s breach of the barge one contract by using inferior materials; and (3) liquidated damages for delivering barge one after the construction period specified in the contract.
The parties tried their claims to a jury in November 2011. At the conclusion of LAD’s case in chief, SDS moved for a directed verdict on two issues related to the contract for barge two: (1) whether PDVSA’s not wanting SDS to use LAD to build the second barge constituted a fortuitous event that either made SDS’s performance impossible, or constituted a failure of cause; and (2) whether LAD had breached the security agreement provision in the barge two contract. The trial judge denied the motion for directed verdict on the first issue, namely, impossibility or failure of cause. However, the trial judge granted the motion for directed verdict on the second issue, finding that LAD breached the security agreement provision in the barge two contract. Nonetheless, the trial judge permitted that issue to go to the jury.
The jury found in favor of LAD.[4] It awarded LAD $99,700 for SDS’s breach of the barge rental contract, $204,600 for SDS’s breach of the contract for barge one, and $566,806.50 for SDS’s breach of the contract for barge two. Further, the jury found LAD did not breach the contract for barge one or barge two.
Subsequently, SDS moved for a new trial, a JNOV, or remittitur. The trial judge granted the motion for JNOV. In that JNOV, the trial judge vacated the jury verdict in its entirety, dismissed all claims against SDS, directed that LAD return $624,300 to SDS, and found SDS was entitled to attorney fees and costs.[5]
*751 LAD filed the present suspensive appeal, asserting three assignments of error:
hi. The trial judge erred in granting a directed verdict in favor of SDS.
2. The trial judge erred in vacating the jury verdict, and granting a JNOV in favor of SDS.
3. The jury erred in failing to award bad faith damages to LAD.
ASSIGNMENTS OF ERROR
Assignment One: Directed Verdict
As noted, LAD’s first assignment, of error urges that the trial judge erred in granting a directed verdict of favor of SDS.
Louisiana Code of Civil Procedure article 1810 provides:
A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict that is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.
This court summarized the jurisprudence on directed verdicts in McNeely v. Ford Motor Co., Inc., 98-2139 (La.App. 1st Cir.12/28/99), 763 So.2d 659, 664, writ denied, 00-0780 (La.4/28/00), 760 So.2d 1182 (citations omitted):
A trial court has much discretion in determining whether to grant a motion for directed verdict. A motion for directed verdict is appropriately granted in a jury trial when, after considering all evidentiary inferences in the light most favorable to the party opposing the motion, it is clear that the facts and inferences are so overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict. However, if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied, and the case submitted to the jury-
On appeal, the standard of review for directed verdicts is whether, viewing the evidence submitted, the appellate court concludes that reasonable people could not reach a contrary verdict. Furthermore, the propriety of a directed verdict must be evaluated in light of the substantive law underpinning the plaintiffs claims.
In the present case, although the trial judge granted a directed verdict for SDS on one issue, she nonetheless allowed that issue to go to the jury. The issue was whether LAD had breached the security provision in the contract for barge two. She later acknowledged in her reasons for judgment on the JNOV that this issue should not have gone to the jury.
LOur research has not found any legal authority directly on point regarding such a procedural situation. However, two cases with related procedural situations provide helpful guidance.
In Dunaway v. Rester Refrigeration Service, Inc., 428 So.2d 1064, 1066 (La.App. 1st Cir.1983), the plaintiff sued a general contractor, Hearn, and its plumb *752 ing subcontractor, Rester, for injuries he sustained while an employee at a hospital where Hearn and Rester were doing repairs. At the close of the plaintiffs case, both defendants moved for directed verdicts. The trial judge granted Rester’s motion and denied Hearn’s. Hearn then chose to present evidence after the denial of its motion for a directed verdict. Upon appeal, Hearn argued that the trial judge erred by not granting its motion for a directed verdict. This court found that, by presenting evidence after the denial of that motion, Hearn had abandoned that motion. Id. at 1072. One way Dunaway differs from the instant case is that the motion there concerned the entire case against a defendant; here, the motion for directed verdict concerned only part of the case against the defendant.
Additionally, in Goza v. Cornwell, 622 So.2d 704, 705 (La.App. 1st Cir.1993), the plaintiff was a horse rider seeking damages from the owner of another horse and other defendants. At the conclusion of the plaintiffs case, the defendant horse owner moved for a directed verdict. The trial judge took the motion under advisement, and the defendants then presented their evidence to the jury. The jury returned a verdict finding the plaintiff 20% at fault, and the owner of the other horse 80% at fault. Id. At that point, the trial judge granted the pending motion for directed verdict, finding that the defendant’s horse had created no unreasonable risk of harm. The plaintiff appealed the judgment granting the directed verdict. This court found that it was error for the trial judge to have granted a directed verdict after the case had been submitted to the jury, because:
the motion is deemed submitted to the action of the jury and the trial court is powerless to grant a motion for a directed verdict after that point. Whatever The verdict of the jury is will be the judgment of the court, unless set aside by the judge granting a later filed motion for a judgment notwithstanding the verdict, or unless abrogated by the court, by granting a motion for new trial.
Id. at 708.
Reading these two cases together yields the conclusion that where a motion for a directed verdict is made, but the subject of that motion nonetheless goes to the jury, then the jury verdict will control over the directed verdict. Applying that reasoning here, we find that when the trial judge granted the motion for directed verdict on the issue of breach of the security clause, and then permitted that same issue to go to the jury without objection of the parties, the jury’s verdict controls. That finding makes moot the first assignment of error.
Assignment Two: JNOV
LAD’s second assignment of error urges that the trial judge erred in vacating the jury verdict, and granting the JNOV in favor of SDS.
The procedural device of JNOV, authorized by LSA-C.C.P. art. 1811, allows a trial judge to rectify an erroneous jury verdict by changing the jury’s finding on liability, or damages, or both. See Smith v. State, Dept. of Transp. & Dev., 04-1317, 04-1594 (La.3/11/05), 899 So.2d 516, 524. In the Smith decision, our supreme court summarized the jurisprudence on how a trial court is to assess a motion for a JNOV:
[A] JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party *753 that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.
Id. at 524-25 (citations omitted). The supreme court explained in Smith that “[t]he JNOV strict criteria is predicated on the rule that ‘when there is a jury, the jury is the trier of fact.”’ Id. at 525 (citations omitted).
The Smith decision then went on to summarize the approach that an appellate court is to use when it reviews a trial judge’s grant of a JNOV:
[A]n appellate court must initially determine whether the district judge |serred in granting the JNOV by employing the above-mentioned criteria in the same manner as the district judge in deciding whether to grant the motion. In other words, the appellate court must determine whether the facts and inferences adduced at trial point so overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary finding of fact. If the answer is in the affirmative, then the appellate court must affirm the district court’s grant of JNOV. However, if the appellate court determines that reasonable minds could differ, then the district judge erred in granting the JNOV and the jury verdict should be reinstated.
Id. (citations omitted).
Applying those principles, the setting here is one in which the jury generally returned a verdict in favor of LAD, and the trial court’s JNOV reversed that verdict and generally found in favor of SDS. In reviewing the JNOV, we will address each of the three contracts separately.

Contract for Barge Rental

As noted above, one of LAD’s claims was for back rent on two barges that it had leased to SDS. At trial, the jury returned a verdict on this issue, awarding LAD $99,700 for SDS’s breach of the rental contract. In the judgment granting the JNOV, although the trial judge stated that she was vacating the verdict in favor of the plaintiff, she did incorporate into her judgment a credit of $99,700 that SDS owed LAD for barge rent. In her written reasons for that judgment, the trial judge explained that, on the issue of back rent for the two rental barges, she found that this $99,700 was properly deducted out of the initial funds SDS paid to LAD at the start of the contract for barge two. The trial judge characterized this as an imputation of payment that SDS had directed LAD to make from the funds it paid at the start of the contract to construct barge two. Thus, while the trial judge took a different approach in how she attributed the amount owed, she actually agreed with the jury’s verdict on the main point on this issue: SDS did owe LAD the sum of $99,700 in unpaid rent.
As an appellate court, our concern is to review judgments, because “appellate courts review [a] judgment, not reasons for judgment.” Moreno v. Entergy Corp., 12-0097 (La.12/4/12), 105 So.3d 40, 52 (citation omitted). A trial judge’s reasons for judgment form no part of the judgment, but are merely an explanation of the judge’s determinations. See Wooley v. Lucksinger, 09-0571 (La.4/1/11), 61 So.3d 507, 572. [ sTherefore, we need not *754 decide whether the $99,700 amount should be seen as a breach of contract, or merely as a debt whose satisfaction is imputable from a payment on a different contract. From our perspective, there is nothing for this court to review on the issue of unpaid rent under the barge rental contract. As we later reverse the JNOV in its entirety because of a different issue, and as the jury’s verdict and the JNOV on this point did not differ in substance, the judgment in accordance with the jury’s verdict will become this court’s judgment on the issue of the barge rental.

Contract to Construct Barge One

On this contract, LAD alleged in its petition that SDS underpaid it $235,000 for barge one, and thereby breached that contract. By contrast, SDS claimed that it had paid in full for barge one, by imputing the final $225,600 it owed on barge one, from its initial payment of $929,600 on barge two.[6] However, the jury disagreed with both amounts, and awarded LAD $204,600 for the breach of the contract for barge one. Likewise, the trial judge, in granting the JNOV, viewed the sum of $204,600 as an amount that SDS still owed on barge one and determined that the payment of that debt should be imputed to, and paid from, the $929,600 initial payment SDS made to LAD for barge two. The trial judge then incorporated that $204,600 debt SDS owed LAD into her judgment. Thus, as with the contract for the lease of the two rental barges, the judgment in accordance with the jury verdict and the judgment granting the JNOV actually agreed on the essence of the judgment: the remainder of what SDS owed LAD for barge one amounted to $204,600.
As we noted in our discussion of the rental contract, as an appellate court, our concern is to review judgments, because “appellate courts review [a] judgment, not reasons for judgment.” Moreno, 105 So.3d at 52 (citations omitted). Therefore, we need not decide whether the $204,600 remainder that SDS owed LAD should be seen as a breach of contract or as a debt whose payment is imputable out of a payment on a different contract. Hence, there is nothing for this court to review on the issue of the $204,600 remainder that SDS owed LAD under the barge one contract, because the |10JNOV did not materially differ from the jury’s verdict on this issue. As we later reverse the JNOV in its entirety because of a different issue, and as the jury’s verdict and the JNOV on this point did not differ in substance, the judgment in accordance with the jury’s verdict will become this court’s judgment on the barge one contract issue.

Contract to Construct Barge Two

This part of the dispute is what the parties devoted most of their attention to at trial. It is the issue for which the jury awarded the most damages. It also proved to be the pivotal issue for the trial judge’s decision to grant the JNOV. In this claim, LAD alleged that it was entitled to unspecified lost profits from SDS’s cancellation of the contract to construct the second barge, as well as bad faith damages. SDS alleged that it was entitled to recoup $704,000 of its initial payment of $929,600 to LAD on this contract that PDVSA had SDS cancel.
The jury awarded LAD $566,806.50 for SDS’s breach of this contract. Then, in sharp contrast, the trial judge’s JNOV found that SDS was entitled to recoup *755 $624,300 from LAD. The trial judge’s written reasons for judgment explained that she arrived at that amount by starting with the $929,600 that SDS had paid to LAD under the barge two contract. She then reasoned that SDS was justified in imputing $204,600 of that amount to the balance SDS owed LAD for barge one. She further reasoned that SDS was justified in imputing $99,700 of that amount to the back rent it owed LAD for the two leased barges. After subtracting the $204,600 and the $99,700 from $929,600, the trial judge arrived at a remainder of $624,300, the amount that the JNOV ordered LAD to return to SDS.[7]
As an appellate court, we are to assess a JNOV using the same standard a district judge is to use: “determine whether the facts and inferences adduced at trial point so overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary finding of fact.” Smith, 899 So.2d at 525.
The trial judge’s reasoning on the barge two contract was that LAD failed to adhere to the security provision in that contract and, in doing so, precluded itself from h Requiring SDS to perform its obligations under the contract, because “a party cannot claim breach when he himself is in default.” Thus, in granting the JNOV, the trial judge found that SDS had proved an affirmative defense that legally excused it from performing its end of the contract, and had proved it so overwhelmingly that no reasonable jury could have found otherwise.[8]
The security agreement clause in the barge two contract required LAD to do several things: grant SDS a security interest in the materials for the barge and the barge itself, segregate the materials for the barge from other inventory, plus mark, tag, or otherwise identify the materials, and indicate SDS’s security interest.[9]
Our review of the record requires us to disagree with the trial judge’s decision for four reasons. '
First, the trial judge’s statement of the applicable legal rule concerning contractual breach that precludes enforcement was incomplete. Her statement was that “a party cannot claim breach when he himself is in default.” However, the full statement in the primary case that the trial court cited as authority on this point says the following: “where one party substantially breaches a contract, the other party to it has a defense and an excuse for nonperformance.” Commerce Ins. Agency, Inc. v. Hogue, 618 So.2d 1048, 1052 (La.App. 1st Cir.1993), writ denied, 626 So.2d 1171 (La.1993).[10] Thus, not every *756 breach excuses the other party from the contract.
It should also be noted that one party’s substantial breach, which would preclude |12his enforcement of the contract, is an affirmative defense that may be asserted by the other party. See id. The party asserting the affirmative defense has the burden of proving it by a preponderance of the evidence. Hurst v. Judson, 02-2412 (La.App. 1st Cir.7/2/03), 859 So.2d 53, 55. Thus, it was SDS’s burden at trial to prove that LAD had substantially breached the contract.
The question to resolve on this affirmative defense should have been: whether the record showed that SDS had proved that LAD had substantially breached the contract’s security agreement provision so overwhelmingly that no reasonable jury could have found otherwise.
The word “substantially” is critical, as one of the cases cited by Hogue illustrates. That case is Central La. Electric Co. v. Giant Enterprises, Inc. 371 So.2d 641 (La.App. 3rd Cir.1979). In Giant Enterprises, a property owner, CLECO, had engaged a contractor to clear the trees from a parcel of forested land. When CLECO sued the contractor, Giant Enterprises, alleging that it had failed to perform fully and timely, Giant Enterprises asserted that CLECO itself had breached the contract in several ways and thus could not complain about its performance. The Third Circuit found none of those arguments by Giant Enterprises persuasive.
Illustrative of Giant Enterprises’ arguments was that CLECO failed to provide adequate access to the land Giant Enterprises was to clear. The Third Circuit held that the actual cause of the contractor’s lack of timely performance in clearing the land was not because of anything CLECO had done, but because of something the contractor failed to do: drain the land’s swampy areas. The Court explained:
[E]ven if the lack of access to parts of the land could be considered a breach of this contract, it was not a substantial breach thereof because it was not an actual cause of the contractor’s failure to comply with its obligations. It is obvious Giant did not consider this to be a real cause of any delay in its work at the time, because it made no request for an extension of the completion date by reason thereof under Paragraph 9 of the General Conditions of the contract.
Giant Enterprises, 371 So.2d at 648.
The reasoning of Giant Enterprises applies here. As with CLECO, even if LAD had failed to properly adhere to the security agreement clause in the barge two contract, |13and even if no notice by SDS to LAD of that lack of performance were required, LAD’s failure was not a substantial breach because it was not an actual cause of SDS’s failure to comply with its obligations. Here, the real cause of SDS’s failure to perform was not anything LAD had done, but something SDS had done: go along with a request by its client, PDVSA, that it not use LAD for barge two.
*757 SDS’s project manager on the barge two contract was Charlie Albert. At trial, Mr. Albert explained: “PDVSA said they wanted to cancel the contract on the second barge because they did not like the craftsmanship that was on the first barge.”[11] Mr. Albert also conceded that SDS chose to cancel its contract with LAD for barge two because, if it had not done so, it would have lost its contract with PDVSA. This evidence in the trial record supports the conclusion that the actual cause of SDS’s failure to perform its end of the barge two contract was not due to any failure by LAD to adhere to the security clause in the contract; thus, any such failure by LAD was not a substantial breach of the contract. See Giant Enterprises, 371 So.2d at 648. Therefore, for JNOV purposes, the record contains ample evidence from which a reasonable jury could have found that SDS failed to prove its affirmative defense that a breach by LAD of the security clause in the barge two contract constituted a substantial breach, thereby excusing SDS from performance.
Second, and farther applying the reasoning of the Giant Enterprises case, a reasonable jury also could have concluded that SDS did not consider LAD’s lack of adherence to the security clause in the barge two contract an actual cause of SDS’s nonperformance. The project manager for SDS, Mr. Albert, testified that he never sent LAD any written notice of default, even though paragraph 13 of the contract required that SDS provide LAD with written notice of any default.[12]
|, ¿Third, a separate reason why a reasonable jury could have concluded that SDS failed to prove its affirmative defense of LAD breaching the security clause is that written notice of default was required by the contract. That part of the contract required not only written notice of any default by LAD, but also provided that LAD then had 30 days in which to cure any such default. That lack of the contractually-required written notice of default, in and of itself, could have caused a reasonable jury to conclude that SDS had not proved that LAD breached the security clause.
Fourth, yet another reason why a reasonable jury could have concluded that SDS did not prove that LAD’s actions in regard to the security agreement constituted a substantial breach is that conflicting proof was adduced at trial about whether LAD did, or did not, adhere to the security clause. As noted above, that part of the barge two contract required that LAD grant SDS a security interest in the materials for the barge and the barge itself, segregate the materials for the barge from other inventory, as well as mark, tag, or otherwise identify the materials, and indicate SDS’s security interest.[13] The issue of whether LAD complied with that clause took up much of the four-day trial. The following examples illustrate the record’s conflicting evidence on the issue.
As for marking, tagging, or identifying the barge two materials, LAD’s employee handling logistics, Wade Trahan, testified *758 that one could determine which steel was for barge two because the pieces of steel could be identified using the “heat number” on the tags the manufacturer welded to the steel. However, Mr. Trahan also conceded that, because some steel plates were dirty, sometimes the heat numbers were not visible. An inspector for a barge certification organization, Gerald Dufresne, stated that a heat number, in and of itself, does not tie a piece of steel to a particular owner. By contrast, an inspector for a contractor for PDVSA, Morris Raphael, testified via trial deposition that he saw LAD personnel using job numbers on the steel that identified the steel with the job for PDVSA.
Mr. Trahan also said that while he was directed to mark some of the steel for barge two with orange paint, he also acknowledged that some of the steel was | ^delivered to LAD already painted in various colors by the manufacturer, making it hard to mark it with a color that would specifically identify the steel as being for barge two. Likewise, the LAD superintendent who ran its yard, Joe Cavalier, acknowledged that paint marks identifying the barge two steel would fade and rust over time; however, he said that LAD was still able to identify which steel was for barge two because LAD kept it all in a certain area of its yard.
Mr. Cavalier acknowledged that LAD had moved the barge two steel around its yard at least a dozen times; however, he said LAD was able to continue to identify which steel was for barge two because, when it moved that steel, “we moved it all at one time.”
LAD’s owner, Lee Dragna, conceded at trial that LAD did not write onto each piece of steel that it was for SDS. He explained that it was not possible to write on every piece of steel specifically that it was owned by SDS. However, Mr. Drag-na also testified that his employees’ painting of the barge two steel with orange paint did identify it to everyone at LAD as SDS’s steel. He admitted that the paint marking did not “tell the world” that it was SDS’s steel. However, he also stated that it was never his intent when he wrote the security clause to identify the steel to non-parties to the contract, such as a sheriff who might show up at LAD’s yard to seize LAD’s inventory.
While the evidence ran both ways on the issue of whether LAD had breached the security clause, in the JNOV context, our review of the record leads us to conclude that a reasonable jury could have found that SDS failed to prove that LAD’s actions substantially breached the security clause. Accordingly, as to the barge two contract, we find that the trial judge erred in granting the JNOV on the issue of whether LAD had substantially breached the contract for barge two and thereby precluded itself from enforcing that contract. Because that reasoning by the trial judge was the foundation upon which the entire JNOV rested, we are required to reverse the JNOV granted by the trial judge in its entirety and reinstate the judgment reflecting the jury’s verdict.
We review the issue of the appropriate damages associated with SDS’s breach of the barge two contract in our review of assignment of error three.
| ^Assignment Three: Bad Faith Damages
LAD’s third assignment of error urges that the jury erred in failing to award LAD bad faith damages. The jury found that SDS had breached the barge two contract in bad faith and awarded LAD $566,806.50 in damages. On appeal, LAD argues that this award does not fully compensate it for SDS’s bad faith breach of the contract for the second barge, because it would only compensate LAD for its lost *759 profit on barge two. LAD argues that the lost profit on barge two was only part of the bad faith damages LAD sustained that related to the barge two contract. By contrast, SDS argues on appeal that the jury’s finding that there was any bad faith breach by SDS in connection with the contract for the second barge is without support in the record.
As we noted earlier, the trial judge’s granting of a JNOV in favor of SDS rested on her conclusion that LAD breached the security clause in the barge two contract and thereby precluded itself from enforcing the contract against SDS. We have already determined that conclusion was incorrect and, accordingly, the JNOV must be reversed and the jury verdict reinstated. Thus, for purposes of the third assignment of error, we now review the jury’s verdict on damages for breach of the barge two contract.
The judgment rendered in accordance with the jury’s verdict is somewhat incomplete when compared with the jury verdict form. The initial language in the judgment, preceding its decretal language, states that the jury found SDS breached the barge two contract in bad faith and awarded $566,806.50 for that breach. However, the corresponding sentence in the decretal portion of the judgment states simply that there is judgment in favor of LAD and against SDS for $566,806.50. A review of the jury verdict form sheds more light on the award for $566,806.50. The corresponding answers to the jury interrogatories about the barge two contract state that the jury found: (1) LAD proved that SDS breached the barge two contract, (2) LAD proved that SDS breached the barge two contract in bad faith, and (3) the “award to LAD for [SDS’s] breach of the second barge contract” was $566,806.50. Thus, while the verdict form shows that the jury’s award of $566,806.50 was for breach of the barge two contract, it fails to say how much it awarded for each of the two types of breach. [ ¶ ./Therefore, to address the question this assignment poses about the amount of bad faith damages the jury should have awarded for breach of the barge two contract, we must consider both types of breach of the barge two contract: the bad faith breach and the simple breach.[14]
We will first consider the bad faith aspect of this part of the jury’s finding on SDS’s breach of the barge two contract.

Bad Faith Breach of Contract

The Second Circuit recently summarized what constitutes a bad faith breach of contract in Volentine v. Raeford Farms of La., L.L.C., 48,219 (La.App. 2nd Cir.7/24/13), 121 So.3d 742, 753, writ denied, 13-2493 (La.1/17/14), 130 So.3d 948 (citations omitted), as follows:
The term bad faith means more than mere bad judgment or negligence and it implies the conscious doing of a wrong for dishonest or morally questionable motives. Bad faith is an intentional and malicious failure to perform. The determination of whether a party acted in bad faith is a factual issue.
The Second Circuit also recently explained that “bad faith means more than mere bad judgment or negligence; it implies the conscious doing of a wrong for dishonest or morally questionable motives.” Benton v. Clay, 48,245 (La.App. 2nd Cir.8/7/13), 123 So.3d 212, 219.
In the present case, the jury found as a fact that SDS had breached the barge two contract in bad faith. Our review of the jury’s finding of bad faith is governed by the manifest error or clearly wrong standard, which provides that a *760 court of appeal may not overturn a factual finding unless it is manifestly erroneous or clearly 'wrong. See Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). To affirm the factual findings of the trier of fact, the supreme court has put forth a two-part test for the appellate review of facts: (1) the appellate court must find from the record that there is a reasonable factual basis for the finding of the trier of fact; and (2) the appellate court must further determine that the record establishes that the finding is not clearly wrong (manifestly erroneous). Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, if there is no | ^reasonable factual basis in the record for the trier of fact’s finding, no additional inquiry is necessary to conclude there was manifest error. However, if a reasonable factual basis exists, an appellate court may set aside a factual finding only if, after reviewing the record in its entirety, it determines the factual finding was clearly wrong. See Stobart v. State, through Dep’t of Transp. and Dev., 617 So.2d 880, 882 (La.1993); Moss v. State, 07-1686 (La.App. 1st Cir.8/8/08), 993 So.2d 687, 693, writ denied, 08-2166 (La.11/14/08), 996 So.2d 1092. If the trier of fact’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse those findings even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. Hulsey v. Sears, Roebuck & Co. 96-2704 (La.App. 1st Cir.12/29/97), 705 So.2d 1173, 1176-77.
The jury’s verdict here does not spell out how, in its view, SDS acted in bad faith in its breach of the contract for barge two. LAD argues that the jury’s verdict on this point found bad faith from SDS’s cancellation of the contract for barge two. Our examination of the record does not lead us to that conclusion.
At trial, SDS’s project manager, Charlie Albert, testified that SDS cancelled the contract because the customer to whom it planned to deliver the second barge, PDVSA, did not like the quality of LAD’s craftsmanship on the first barge. LAD’s owner, Lee Dragna, testified that Mr. Albert told him that PDVSA’s reason was that the yard where LAD built barges was not nice enough. Mr. Albert also testified that he inspected the work LAD did on the first barge three or four times during construction, and had no complaints to LAD about the work it was doing. Notably, the record also contains stipulated testimony from Mr. Albert that “SDS had millions of dollars invested in its relationship with PDVSA.” In his oral testimony, Mr. Albert explained that SDS felt compelled to cancel the contract with LAD, because it simply could not afford to lose PDVSA as a customer. While the record clearly shows that when SDS cancelled the barge two contract, it breached that contract intentionally, our reading of the record fails to show that SDS’s cancellation was “for dishonest or morally questionable motives.” See Benton v. Clay, 123 So.3d at 219.
11 ¡/Thus, the record provides no reasonable factual basis for the jury to have found that SDS’s act of cancelling the barge two contract constituted a bad faith breach and, in our view, such a finding would have been clearly wrong (manifestly erroneous). See Mart v. Hill, 505 So.2d at 1127. Inasmuch as the record does not supply a factual basis for the jury to have concluded that the cancellation of the barge two contract constituted a bad faith breach of contract by SDS, that finding forecloses further inquiry on the issue of whether SDS’s actions after the breach constituted a bad faith breach. That conclusion flows from Comment (b) to LSA-C.C. art. 1997, Revision Comments—1984. *761 That comment explains that “[a]n obligor is in bad faith if he intentionally and maliciously fails to perform his obligation.” Accordingly, it is the conduct in failing to perform, or in breaching the contract, that is relevant to whether a party was in bad faith, not the party’s actions subsequent to the breach. Therefore, SDS’s actions after it breached the barge two contract do not constitute a bad faith breach. Thus, for example, SDS’s abandoning at LAD’s facility the steel that LAD was to use to build barge two would not constitute a bad faith breach, as SDS did that subsequent to having breached the barge two contract.

Damages for Simple Breach of Barge Two Contract

We next review the amount of damages that should be awarded for SDS’s simple breach of the barge two contract.
We begin by noting that the Civil Code instructs that damages, other than those for bad faith breach, are measured by the loss sustained by the obligee and the profit of which he has been deprived. See LSA-C.C. art. 1995. Furthermore, an obligor in good faith is liable only for the damages that were foreseeable at the time the contract was made. LSA-C.C. art. 1996. We also note that the Louisiana Supreme Court has stated that, “[g]enerally, recovery for damages upon the breach of a contract is limited to the loss a person has sustained or the profit of which he has been deprived.” Meador v. Toyota of Jefferson, Inc., 332 So.2d 433, 434-35 (La.1976).[15] Put another way: “[t]he measure of damages for a breach of contract is the sum that will place |aiplaintiff in the same position as if the obligation had been fulfilled.” Dixie Roofing Co. of Pineville, Inc. v. Allen Parish Sch. Bd., 95-1526 (La.App. 3rd Cir.5/8/96), 690 So.2d 49, 56, writs denied, 96-2084 (La.11/8/96), 683 So.2d 276, and 96-2100 (La.11/8/96), 683 So.2d 277.
At trial, Mr. Dragna testified that his projected profit for barge two was $787,806.50. He derived that figure by using his profit from barge one, which had the same specifications as barge two. However, one must deduct from the total projected profit the initial payment of $225,600 that LAD received from SDS for barge two on March 21, 2008.
Also relevant to the damage calculation is the fact that SDS sent LAD a payment of $704,000 on March 21, 2008, for LAD to use to buy the steel for the second barge. However, Mr. Dragna acknowledged he did not spend all of that amount to buy steel for barge two. He testified that he only purchased $676,458.40 worth of steel. Mr. Dragna conceded at trial that the barge two contract did not permit LAD to simply keep any overage in the $704,000 payment. Thus, the overage for the steel, which amounts to $27,541.60, must also be deducted from Mr. Dragna’s net profit to arrive at LAD’s true lost profit.
Thus, the record supports the conclusion that LAD’s' lost profit from barge two, adjusted, is as follows:
Gross lost profit on barge two: $787,806.50
Minus initial payment on contract: -225,600.00
Minus overage in steel payment: -27,541.60
Adjusted lost profit on barge two: $534,664.90
*762 LAD urges on appeal that it should also be compensated for the profit it lost when it turned down a request to build one or two barges for C & R Construction (C & R) because LAD had committed to SDS that it would be available to build barge two. However, that would exceed what the law allows. LAD could have used its time to build barge two for SDS, or it could have used its time to build one or two barges for C & R. It could not do both at the same time. Mr. Dragna testified at trial that he had to turn |⅞1 down the chance to build what C & R wanted because he had already committed to build the second barge SDS wanted. As Mr. Dragna himself explained at trial in response to a question from SDS’s counsel about LAD’s capacity to build what C & R wanted him to build: “I couldn’t squeeze him in if I was doing your barge.” Therefore, compensating LAD with what it would have earned from building one or two barges for C & R, after having already compensated LAD with damages for what it would have earned building barge two for SDS, would mean paying LAD twice for the same loss. When one sustains a loss because of a breach of contract, the law does not authorize compensation twice for the same loss. Nat’l Tea Co. v. Plymouth Rubber Co., Inc., 95-254 (La.App. 5th Cir.10/18/95), 663 So.2d 801, 811 (holding “[d]ouble recovery is sometimes allowed in a tort situation in an attempt to balance the risk taken by a plaintiff in settling with a defendant when that defendant’s percentage of fault has not yet been determined. However, the allowance of a double recovery in a contractual situation, in which the damages are fixed, is inappropriate.”).
Therefore, we conclude that the record supports the conclusion that a reasonable jury could have awarded LAD $534,664.90 for SDS’s simple breach of the barge two contract.
Assessing the amount of damages for SDS’s breach of the barge two contract inherently involves resolving questions of fact. Thus, we review the jury’s finding on the amount of those damages under the manifest error standard. As we have noted, under that standard, if a reasonable factual basis exists, an appellate court may set aside a factual finding only if, after reviewing the record in its entirety, it determines the factual finding was clearly wrong. See Stobart, 617 So.2d at 882.
The jury verdict form specifically states that the jury found that SDS breached the barge two contract, that SDS breached the barge two contract in bad faith, and that SDS’s breach of the barge two contract resulted in damages of $566,806.50. However, there are some details the verdict form does not supply. For example, the verdict form does not explicitly state whether the jury found that SDS committed a simple breach; and, if so, what dollar amount of damages it assigned to SDS’s simple breach. The |agportion of the judgment rendered in accordance with the jury verdict that corresponds to the breach of the barge two contract simply states that there be judgment against SDS and in favor of LAD for $566,806.50. Thus, in reviewing the issue of the barge two contract damages, we do not have as much information about the jury verdict as we would like to have.
The present case is not unique in having a judgment and jury verdict form lacking all the detail a court of appeal would like to have. For example, the Third Circuit faced a similar situation recently in Monte v. State Farm Mut. Auto. Ins. Co., 13-979 (La.App. 3rd Cir.5/21/14), 139 So.3d 1139, 1148. The court noted that “the fact that *763 the elements of special damages were not itemized on the jury verdict form, while not legally deficient, does impair our ability to divine the exact amounts the jury awarded for the various categories of special damages.” Id. Despite that challenge, the Third Circuit found that a careful examination of the record allowed it to resolve the issue before it. See id. at 1148-50. We will borrow that approach here.
The jury’s ultimate finding on the damages for the breach of the barge two contract was that those damages, all totaled, amounted to $566,806.50. Logically, this total amount appears to have included some amount for what the jury saw as SDS’s bad faith breach of the barge two contract. However, from our review of the record no reasonable factual basis exists in the record to support a finding that SDS’s breach of the barge two contract was in bad faith. Thus, it would have been error for the jury to have made any award based on a finding that SDS’s actions constituted a bad faith breach of the barge two contract. As we have determined that the record does support an award of damages of $584,664.90 for SDS’s simple breach of the barge two contract, we draw the logical inference that the jury’s award for bad faith breach was the difference between $534,664.90 and the total damages the jury awarded, $566,806.50. That difference is $32,141.60. As we have found the record does not support the conclusion that SDS breached the barge two contract in bad faith, we likewise find that the record does not support awarding the amount of $32,141.60 as bad faith damages to LAD.
^Accordingly, we affirm the portion of the jury’s award that we have determined represents damages for simple breach of the barge two contract, $534,664.90; and, we reverse the portion of the jury’s award that we have determined represents damages for bad faith breach of the barge two contract, $32,141.60.
Ancillary Matters: Interest, Attorney Fees, and Costs
The judgment rendered in accordance with the jury’s verdict stated that a ruling on the issues of legal interest, attorney fees, and court costs was reserved until a later hearing on a motion regarding those matters. The JNOV found SDS was entitled to attorney fees and costs associated with the litigation “under the contract,” and taxed LAD with the court costs for the trial. However, we have found that SDS is liable to LAD, as follows: (1) under the contract to rent two barges, $99,700; (2) under the contract to build barge one, $204,600; and (3) under the contract to build barge two, $534,664.90. In addition, legal interest is awarded on all three amounts from the date of judicial demand.
The contract for the rental of two barges contained no provision regarding attorney fees; therefore, we award none in relation to the dispute over that contract. However, the contracts to construct barges one and two provided that “[t]he prevailing party in any action brought hereunder shall be entitled to recover its attorney’s fees and cost[s] from the non-prevailing party, including those fees and costs incurred in the trial and appellate courts.” As LAD has now prevailed in the dispute over those two contracts, we therefore find LAD is entitled to its attorney fees and costs related to the trial and appeal of those two contracts. Furthermore, we find that the court costs of the trial and this appeal shall be taxed to SDS, which costs shall be determined by a rule to show cause in the district court pursuant to LSA-C.C.P. art. 1920.
DECREE
We reverse the trial judge’s granting of the JNOV in its entirety. Further, we *764 reinstate the March 23, 2012 judgment that was rendered in accordance with the jury’s verdict, affirm that judgment in part, and reverse that judgment in part. The total amount of damages is $838,964.90. Additionally, we order that this matter be [¡.¿remanded to the trial court for a determination of legal interest, attorney fees, and court costs.
JNOV REVERSED; MARCH 23, 2012 JUDGMENT REINSTATED, AFFIRMED IN PART, AND REVERSED IN PART; AND REMANDED.
GUIDRY, J., concurs in the result.

. The barge builders were two separate legal entities. However, the trial testimony did not draw any real distinction between the two entities. Thus, for convenience in this opinion, we will generally refer to them as if they were one entity.

. For example, in the contract for barge one, SDS agreed to pay LAD $225,600 for a down payment at the beginning of the contract, and agreed to pay $600,000 for LAD to purchase the steel for the barge at the beginning of the contract.

. At trial, the parties differed on the reason PDVSA wanted SDS to cancel its contract with LAD for barge two. SDS's project manager, Charlie Albert, said PDVSA’s stated reason was that it did not like LAD’s craftsmanship on barge one. LAD’s owner, Lee Dragna, said Mr. Albert told him that PDVSA's reason was that the yard where LAD built barges was not nice enough.

. The judgment reflecting the jury verdict was in favor of LAD Services of Louisiana, L.L.C. The judgment did not mention LAD Salvage, L.L.C.

. In her written reasons for judgment, the trial judge also acknowledged that the issue on which she granted a partial directed verdict — whether LAD had breached the security *751 provision in the barge two contract — should not have gone to the jury.

. In the contract for barge two, SDS agreed to pay LAD, at the start of the contract, $225,600 as a down payment and $704,000 for LAD to use to purchase the steel for that barge.

. Our calculations using these same numbers produce a slightly different remainder: $625,300.

. We note that the trial judge acknowledged in her reasons for judgment on the JNOV motion that, when rendering her decision, she did not have the benefit of a full trial transcript.

. The security agreement clause is paragraph 11 of the barge two contract.

. We recognize that the word "substantial,” found in Hogue, is not found in a much earlier case from the Louisiana Supreme Court, which was also cited by the trial judge. That case is Silverman v. Caddo Gas & Oil Co., 127 La. 928, 54 So. 289 (La.1911). Silverman’s "Syllabus by the Court” states: "[a] party cannot claim damages for the nonperformance of a contract as to which he himself is in default.” Id. at 928 and at 289. Silverman involved a contract for ongoing sales of oil. The plaintiff was the buyer; the defendant was the seller. The plaintiff sought to recover for the defendant’s alleged breach of its obligation to deliver the oil. As one of its defenses, the defendant asserted that the plaintiff had defaulted earlier on the contract by having failed to pay for the oil. The Louisiana Supreme Court affirmed the court below, finding that the plaintiff’s nonpayment legally *756 excused the defendant from its obligation to deliver. While Silverman did not explicitly discuss whether the plaintiff’s nonpayment was a "substantial” breach, it appears that the plaintiff's earlier nonpayment was the actual cause of the defendant’s declining to deliver more oil to him. Thus, it also appears that the plaintiff’s breach would be considered substantial by the reasoning of more recent decisions, such as Hogue and Central La. Electric Co. v. Giant Enterprises, Inc., 371 So.2d 641 (La.App. 3rd Cir.1979). Therefore, we read Silverman as in harmony with the more modern jurisprudence’s view that a breach must be substantial to excuse performance.

. Parenthetical phonetic spelling of PDVSA in trial transcript omitted.

. Paragraph 13 of the contract for barge two provided, in pertinent part:
In the event Builder ... fails to perform any of its obligations under this Agreement, Owner may deliver to Builder a written notice of default setting forth the events of default. Builder will have thirty (30) days from receipt of such notice to cure any such default.... If Builder fails to cure, Owner may terminate this Agreement by written notice....

. This is drawn from paragraph 11 of the contract for barge two.

. By the term simple breach, we mean a breach of contract that is not in bad faith.

. Superseded by statute on other grounds, as stated in Bishop v. Callais (La.App. 4th Cir.1988), 533 So.2d 121.